NEW YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—July, 1884.

WALSH v. LAFFAN.

*In the matter of the application for probate of a paper
propounded as the will of* ELIZA B. BECKETT, *de-
ceased.*

Under 2 R. S., 63, § 40, providing that one who executes an instrument as
his will shall declare its testamentary character *at the time* of making
or acknowledging his subscription, the requirement as to time is
imperative; and evidence of prior communications to the subscribing
witnesses cannot be invoked to eke out the circumstances immedi-
ately attending the execution, where the latter do not include, sub-
stantially, such a declaration.

Upon October 5th, 1881, the occasion of the execution of the paper pro-
pounded as decedent's will, neither decedent nor either of the subscrib-
ing witnesses referred to it as a will, nor used expressions indicating
its testamentary nature. The paper was not read by the witnesses,
nor in their presence by decedent ; and the latter purposely concealed
its contents from their observation. Some weeks previously, dece-
dent had told C., one of the witnesses, that she was going to make a
"preparation" for A., the person who was named as the chief bene-
ficiary, and asked her if she would be willing to sign "a paper" for
her, if asked so to do, confided to C. her affection for A., and stated
that she would give to the latter all her property, and that she was
going to make a will, but she did not know when. On October 5th,
decedent summoned C. to her presence, and said : "There is *the paper*
I spoke to you about signing," or words to that effect, and intimated
that the act might necessitate C.'s attendance in court; whereupon
decedent and C. signed their names to the document.

The other witness, D., had previously, at decedent's request, subscribed
several instruments, one executed as lately as in 1880 or 1881, which
decedent at the time expressly stated to be her last will. On Octo-
ber 5th, D. visited decedent, pursuant to a written request, "in
which she stated that she wanted her to "*sign a paper again,*" as she
proposed to make alterations in a previous one on account of A.'s

sickness ; and D. testified that she knew, at the time, that the instrument effecting such alterations must be a will.—

*Held,* that the paper propounded must be refused probate for the want of publication, as a will, contemporaneous with decedent's subscription or acknowledgement of her signature.

Authorities upon the question—at what time knowledge, that a paper executed as a last will is such, must be communicated by testator to the subscribing witnesses—collated.

PETITION for the probate of decedent's will, presented by Ellen Laffan, a legatee therein named ; opposed by Robert C. Walsh and others, decedent's next of kin. The facts appear sufficiently in the opinion.

F. S. WAIT, *for petitioner.*

CLARK & STEVENSON *and* ANDERSON & MAN, *for contestants.*

THE SURROGATE.—Mrs. Eliza B. Beckett died in this city in the month of October, 1882.   She was a widow without children.   Her surviving next of kin are her two sisters, advanced in years, and several nephews and nieces.   One of the nieces, Alice McBlair, is named as the chief beneficiary in an instrument which has been propounded for probate in this court, and which was executed by Mrs. Beckett on October 5th, 1881.

It is claimed by the contestants that probate should be denied this paper, because the decedent did not, in the presence of its attesting witnesses, declare, at the time she subscribed it, that it was her will.

That she did not make express declaration to that effect is conceded.   On the occasion when it was executed, it was not referred to as a " will " by Mrs. Beckett herself, or by either of the two other persons who took part in its execution, nor did any of the three use words or expressions, asserting or even intimating that the instrument was of a testamentary character.

It was not read by the subscribing witnesses nor was it read in their presence by the decedent herself; and, before she asked them to put their names upon it, she had purposely concealed its contents from their observation.

It is very clear, therefore, that, but for certain evidence as to communications, previously made by Mrs. Beckett to these witnesses, the Surrogate would be obliged to pronounce against probate. But it is claimed that, by means of such communications, the witnesses had, from time to time, acquired such definite information as to decedent's wishes and purposes that, when they were requested to place their names upon the paper now in dispute, they were thoroughly advised, and that too with the knowledge and approval of decedent herself, that the paper was testamentary in its character.

Now what, if anything, had Mrs. Beckett said prior to October 5th, 1881, which can so eke out the circumstances immediately attending the execution of this instrument as to justify me in finding that it was substantially declared by her, in the presence of the attesting witnesses to be her will.

Miss Louise De Cassini was in her service as lady's maid between August 10th and October 17th, 1881, and on the 13th of August accompanied her to Litchfield, Connecticut. On the evening of August 12th, Mrs. Beckett told Louise that she was "going to make a *preparation* for her daughter" (meaning Alice McBlair). "She asked me," Louise testified, "if I would be willing to sign *a paper* for her at any time she would ask it. I told her I would." In the course of the

conversation just mentioned, which took place in the Grand Union Hotel in this city, Mrs. Beckett seems to have freely confided to her maid her affection for Miss McBlair and her intention, at some time in the future, of making provision and probably testamentary provision in her behalf.    She said, among other things, "that she would give Alice all her property, and that she was going to make a will, but that she did not know when." Subsequently, during the visit at Litchfield, Mrs. Beckett, alluding to the conversation of August 12th, again intimated a wish that, at some time thereafter, Louise should *sign a paper* for her. "She asked me," Louise testified, "if I remembered about *the paper* that she spoke to me about, and I told her that I did. She asked me if I would go back on my word, and if I would sign at any time she asked me, and I told her I would.    Then she told me the case might come into court some day and that I need not be afraid; that nothing would happen to me about it." The precise date of this conversation does not appear. It must have been prior to September 17th, as it was then that the Litchfield visit terminated.    The decedent did not again talk to her maid about *signing a paper* until October 5th, the very day on which was executed the instrument here in dispute.    Louise testified that, on that day, she was summoned to the presence of her mistress, who was then occupying apartments in New York city ; that Mrs. Beckett said to her, as she entered the room : "There is the paper I spoke to you about signing," or "This is the paper I wanted you to sign," or "There is the paper that I want you to sign," at the same time indicating a paper then lying upon the table ; that Mrs.

Beckett interrupted her as she was about to write, and, saying that she must herself sign in the first instance, immediately subscribed her name to the instrument; that she then handed the pen to the witness, who proceeded to use it for writing her own name, after receiving another intimation from her mistress that the act might necessitate her attendance at court, but would give her no serious trouble.

I see no reason to doubt that Louise De Cassini intended to give a correct account of what took place when this instrument was executed; but wherever her testimony materially differs from that of Miss Deen, the other subscribing witness, I am disposed for various reasons to credit the latter. Louise states very confidently that she signed before Miss Deen. Miss Deen is positive, on the other hand, that she herself signed first, and the place of her signature confirms the accuracy of her recollection. Upon this point, the conflict of testimony is of little consequence; but there is another which is worthy of special reference. Miss Deen is positive that the only words used by Mrs. Beckett to Louise were these: "I want you to sign that paper." It will very clearly appear, upon reference to the cases cited below, that nothing which is shown to have previously taken place between the decedent and Louise could give to a request thus worded the scope and effect of a declaration, within the meaning of the Statute of Wills. That greater reliance can be placed upon Miss Deen's version of what was said by decedent to Louise than upon the testimony of Louise herself in that regard, seems to me to follow from this circumstance: If decedent's request

had contained a distinct implication that the act which Louise was asked to perform had been the subject of previous conference between herself and her mistress, that fact would scarcely have escaped Miss Deen's attention ; on the other hand, Louise may very naturally have confounded statements made by decedent on October 5th, with others that she had made in relation to the same subject, on previous occasions.

Miss Deen testified that she subscribed her name as a witness to several testamentary papers, which were executed by this decedent prior to the one in question. One of these papers was dated in 1876, another in 1877 or 1878, and still another in 1880 or 1881. At the time of executing the latter, decedent asked Miss Deen's fellow witness if she knew what she had signed. The witness answered that she did not, whereupon the decedent said that the paper was her last will and testament, at the same time appealing to Miss Deen as to her understanding of its character. Shortly prior to the day on which the disputed instrument was executed, the decedent talked with Miss Deen about acting as a witness. I quote from that lady's testimony. "Q. How came you to be there (meaning at Mrs. Beckett's house) at that time? A. She (Mrs. Beckett) asked me to be there. Q. For what purpose? A. She wrote me a note, and when I came there she said she wanted me to *sign a paper again ;* that she wanted to make alterations in a previous one on account of Miss McBlair's sickness. Q. Have you the card or note which Mrs. Beckett wrote to you? A. I do not know whether I have ; she did not mention the paper in the card ; she just wished me to come down. Q. Had she said anything about your

coming down? A. Yes; she said she wanted me to sign a paper some day. Q. And was that all? A. That was all. Q. Did she say what it was? A. She said she wanted to make alterations in the paper on account of Miss Alice's sickness; she said she was sorry to trouble me again to sign the paper. Q. Did she say the paper she had before spoken about? A. Yes; she wanted to make alterations in the previous paper. Q. Then did she produce this paper, the one offered for probate? A. She did; it was on the table when I got there. Q. Did she make any reference to that paper? A. No, sir; only as I said, it was a paper to make alterations." Miss Deen further testified that she knew the character of the paper of which the decedent was speaking from the manner in which she spoke of it; that Mrs. Beckett sometimes referred to the earlier will as a "paper"; and that when she referred to the instrument offered for probate as "a paper making alterations in the other paper," the witness for that reason knew that the paper effecting such alterations must be a will.

Upon this evidence, it is insisted by the counsel for the legatee that the circumstances immediately attending the execution of the instrument here offered for probate, when considered in connection with the various statements and requests previously made by the decedent to the witnesses, constitute a sufficient declaration of the testamentary character of that paper to satisfy the requirements of the statute in that regard. It will be noticed upon careful scrutiny of the evidence, that, in the different conversations which the decedent had with Miss Deen respecting her intention of changing or altering a previous paper (presumably the will

of 1880 or 1881), she never, in speaking of the instru-
ment by which such "change" or "alteration" was to
be effected, used any other term of description than the
word "paper." The precise character of this projected
"paper" was not disclosed. For aught that appears
in the evidence, every one of decedent's statements in
regard to it would have been applicable to any instru-
ment whatever, testamentary or otherwise, by which her
favorite niece could be made the recipient of the addi-
tional bounty which she had decided to give her. Miss
Deen, it is true, testified that, when she subscribed her
name to the paper here propounded, she knew that it
was a will; but it is plain that this knowledge was a
mere inference from the character of previous instru-
ments in whose execution she had participated, and
from the declaration of Mrs. Beckett that the new paper
was designed to effect a change or alteration in one of
earlier date. In the words of the witness, "she spoke
of that paper as her will, and she spoke of this being
an alteration of the other paper, and *of course* I knew
it was her will."

The statutory requirements respecting subscription
and publication are as follows: "Such subscription
shall be made by the testator in the presence of each of
the attesting witnesses, or shall be acknowledged by
him to have been so made to each of the attesting wit-
nesses. The testator, at the time of making such sub-
scription, or at the time of acknowledging the same,
shall declare the instrument so subscribed to be his last
will and testament" ( R. S., part 1, ch. 6, tit. 1, § 40; *3
Banks, 7th ed., 2285*).

In Brinckerhoof v. Remsen (*8 Paige, 488*—1840), this

statute was, for the first time, interpreted by the Court of Chancery. A decedent had subscribed a paper claimed to be her will in the presence of subscribing witnesses, and, in their presence, she had acknowledged it to be "her hand and seal for the purposes therein mentioned." There was no express declaration that the instrument was a will. It was held that the requirements of the statute, as to publication, were not satisfied. The Chancellor, after declaring that a testator need not use any particular form of words to communicate to attesting witnesses the information that he understood the nature of the instrument he was executing, and intended to recognize it as his will, added: "If the fact distinctly and satisfactorily appears, that the testator did not declare to the subscribing witnesses, or in their presence, that the instrument signed by him and attested by them was a will, it is the duty of the court to . . . pronounce such an instrument invalid as a testamentary disposition of the decedent's property."

This decision was subsequently affirmed by the Court of Errors (Remsen v. Brinckerhoff, *26 Wend.*, *325*–1841).

In the course of his opinion favoring affirmance, Chief Justice NELSON said: "The testator must not only declare the instrument to be his last will and testament— he must so declare at the time of signing and acknowledging."

Senator VERPLANCK, after reviewing the state of the law before the statute, and commenting upon the objects ought to be attained by its enactment, said: "When therefore, it was determined that such a declaration should be made essential to the due proof of wills, as

the necessary evidence of the testator's real intent, it was expressly enacted that this declaration should be made to such attesting witnesses *at the time of execution or acknowledgement. How can this positive requirement be satisfied, except by the testator personally making the fact of his own understanding and intention known to the witnesses, at the time, by such express words or signs as could leave no doubt in their minds ?*"

In Rutherford v. Rutherford (*1 Den., 33*—1845), the decedent, at the time of signing a paper claimed to be his will, had published it as a " will or agreement." Such publication was held insufficient.

Brown v. DeSelding (*4 Sandf., 10*) was decided in 1850. A certain person had been summoned, with the knowledge and seeming acquiescence of a decedent, to act as a subscribing witness to her will. Upon coming into her presence, the proposed witness had been introduced to her as such, and had been greeted by her with a nod of approval. She had, thereupon, signed her name. Upon this evidence, the court held that there was a sufficient "request" to satisfy the demands of the statute, but that, despite the fact that the witnesses knew, from what had taken place, that the instrument in question was the decedent's will, it must, nevertheless, be denied probate for lack of due publication. The court used this language: "The utmost that can can be said of this case is that the conduct of the testatrix *implied* the instrument to be her will . . . . If we should hold the mere signature of the will, or any act equivalent to it, without any declaration, either before or after signature, to be a sufficient publication, we

should disregard the plain letter of the statute, which requires that the testator shall, at the time of making the subscription, declare the instrument to be his last will."

The question under discussion came before the Court of Appeals in the case of Seymour v. Van Wyck (6 N. Y., 120—1851). The decedent, whose will was there the subject of inquiry, expressly stated to A., one of the two subscribing witnesses, that he had sent for him because he wished to make an alteration in his will, and that he had caused a codicil to that instrument to be made ready for execution. At decedent's request the paper was produced. A. informed him that two witnesses would be necessary for its due execution. Thereupon, the decedent directed that B. be summoned. Upon his arrival, the decedent signed, and after him the witnesses. Decedent's request to B. was in these words: "I want you to sign your name *to that paper*." He had previously said in B.'s hearing: "You see I am in my right mind"; but he had not told B. the nature of the instrument.

Upon these facts, the court held that the paper had not been duly published as a will.

In the case of *Ex parte* Beers (2 *Bradf.*, 163—1852), notwithstanding the fact that the witnesses to the alleged will inferred from the surrounding circumstances, that it was a paper of a testamentary character, the Surrogate pronounced against its probate, because the evidence failed to establish due publication. "A declaration," said the court, "is an open act, a manifest signification or assertion or assent by words or signs, and it must be made to appear by unequivocal circum-

stances, so that the testamentary character of the instrument is shown to have been communicated by the testator to the witnesses." . . . . . "Casting from our minds all that we know of the character of this paper by inspection, can we, from what transpired at the time, discover a declaration by the decedent to the witnesses that it was a will? That he knew it was a will is reasonable to suppose; that they guessed it was a will appears, but their minds did not meet on that as a common ground. . . . There must be a distinct affirmative performance of all the statutory requisites."

Wilson v. Hetterick (*2 Bradf.*, *427*—1853) is also in point. There the decedent, just prior to the execution of the instrument in dispute, took it from under his pillow and said to the witnesses, whom he had himself caused to be summoned, that he had an instrument in writing which he wished them to witness. One of them read enough of the paper to ascertain its character, and, for aught that he could positively swear, the decedent might have expressly stated that it was a will. The other subscribing witness testified that the decedent referred to the paper as "an instrument in writing." "I had reason to suppose," he said, "it was his will, because he was very sick, and was not expected to live, *and from previous conversations between me and him.* I don't recollect any other "particular reason for supposing it was his will." He was then interrogated as follows: "From what he then said, disconnected from any previous conversation, and from what you saw in the paper, did you infer or not it was his last will and testament?" The witness answered: "*I inferred it was his will, but could not have so inferred from what he then*

*said and what I saw of the paper, had it not been for other and previous circumstances.''*    Upon this state of facts, the Surrogate remarked :    " The ascertainment by the subscribing witnesses of the testamentary nature of the paper must not be conjectural or derived from accidental inspection.    The testamentary declaration must be open and manifest and intentional, and the minds of the parties must meet on that point. The declaration    must be made at the time.    The witnesses cannot spell it out by a hasty glance at a word here and there, or by connecting present acts with previous conversations.    The testator must know that the witnesses know the testamentary nature of the act, and *vice versa*—and this mutual knowledge must arise from something said or signified contemporaneously with the execution of the instrument.''

The instrument whose validity was at issue in the case just cited, like the paper now before me, was in the handwriting of the decedent.

The doctrine of the cases above cited was again asserted by the Supreme court in Burritt v. Silliman (*16 Barb., 198*—1853).

" Unless,'' said the court, in the case just cited, " the testatrix herself, in some intelligible manner, so clear and unequivocal as not to be misunderstood, communicated to the witnesses the fact that she knew and intended the instrument to be her last will and testament, the statutory evidence of the due execution of the will is not furnished.''

In Lewis v. Lewis (*11 N. Y., 220*—1884) the Court of Appeals declared that, " to satisfy the statute, the testator must, in some manner, communicate to the attest-

ing witnesses, *at the time they are called to sign as witnesses*, the information that the instrument then present is of a testamentary character, and that he *then* recognizes it as his will, and intends to give it effect as such. It must be declared to be his last will and testament by some assertion or some clear assent in words or signs, and the declaration must be unequivocal. The policy and object of the statute requires this, and nothing short of this will prevent the mischief and fraud which were designed to be reached by it. It will not suffice that the witnesses have elsewhere and from other sources learned that the document which they are called to attest is a will, or that they suspect or infer, from the circumstances and occasion, that such is the character of the paper. The fact must in some manner, although no particular form of words is required, be declared by the testator in their presence, that they may not only know the fact, but that they may know it from him, and that he understands it, and, at the time of its execution, which includes publication, designs to give effect to it as his will, ⌈and to this, among other things, they are required by statute to attest."

[The decedent in the case just cited had said, in presence of the witnesses, " I declare the within to be my free will and deed."] " This declaration," in the language of the court, " was equivocal, and would be satisfied by a deed executed voluntarily. *It did not necessarily inform the witnesses that it was a will, by excluding every other instrument from the mind.*"

Said Surrogate BRADFORD, in Hunt v. Mootrie (*3 Bradf., 322*—1855): " If anything is to be taken as sub-.

stitution for an express declaration, it must be such an act as is clear and unequivocal, and as gives the basis of a necessary inference that the testator conveyed, intended to convey, and knew that he had conveyed, to the minds of the witnesses, that he executed the paper as his last will and testament. There must be mutuality as to the knowledge of all the parties, testator and witnesses, in respect to the nature of the transaction.

Robinson v. Smith (*13 Abb. Pr.*, *359*—1860) maintains the same doctrine. On the occasion when the instrument there in question was executed, the decedent said to its subscribing witnesses, who had acted for him in like capacity at the execution of a former will: "I have sent for you to sign this paper because you signed the other." This was held to be inadequate publication.

Abbey v. Christy (*49 Barb.*, *276*—1867) is also in point. There the decedent handed the paper propounded as his will to A., one of its subscribing witnesses, requesting him to read it. This A. did in silence. When the reading was concluded, he asked the decedent what else he wanted. The decedent said he wished A. to witness his signature, adding that he had himself heard the will read. B., the other subscribing witness, testified that he saw the decedent sign the paper, and that he himself signed at the decedent's request; that, according to his best recollection, the words of the decedent upon that occasion, were these: "Gentlemen, I wish you to witness my signature to this paper." B. added that decedent might have alluded to the paper as a "document," but that he did not call it a will. This was held to fall short of due publication.

The Court of Appeals, in Gilbert v. Knox (*52 N. Y.*, *125*—1873) gave this new sanction to the doctrines which had been first asserted in the courts of this State more than thirty years before : " It is not sufficient to establish a valid publication of a will, that it appears that the nature of the instrument was known to the testator and subscribing witnesses at the time it was executed. The mode of publication is prescribed by statute, and it requires that the testator, at the time of subscribing or acknowledging his subscription, shall, in the presence of the witnesses, declare the instrument so subscribed to be his last will and testament. . . .
. . . . . . *The knowledge that the instrument which the witnesses are called upon to attest is a will, must be communicated to them by the testator at the time of his subscription or acknowledgement; and knowledge, derived from any other source, or at any other time, of the same fact cannot stand as a substitute for the declaration of the testator.*"

Upon the authority of these cases, I feel bound to declare against probate of the paper here in controversy.

A decree may be entered accordingly.